1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
9                       AT TACOMA

10   DANNY PAUL LANGE,

11                    Plaintiff,                    CASE NO.     C07-5650FDB-KLS

12          v.                                      REPORT AND
                                                    RECOMMENDATION
13   MICHAEL J. ASTRUE, Commissioner of
     Social Security,                               Noted for November 7, 2008
14
                      Defendant.
15

16

17

18

19        Plaintiff, Danny Paul Lange, has brought this matter for judicial review of the denial of his

20   applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

21   been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

22   MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After

23   reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and

24   Recommendation for the Honorable Franklin D. Burgess's review.

25                              FACTUAL AND PROCEDURAL HISTORY

26        Plaintiff currently is 45 years old.[1]  Tr. 59.  He graduated from high school, has two years of college

27

28   _____
          [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

education and past work experience as a grocery warehouse worker and restaurant manager. Tr. 30, 86, 91, 98, 144, 149, 169, 633, 635.

On October 9, 2003, and October 22, 2003, plaintiff filed an application for SSI benefits and for disability insurance benefits respectively, alleging disability as of March 5, 2002, due to sleep deprivation, anxiety attacks, agoraphobia, obsessive compulsive disorder, major depression, avoidant personality disorder, herniated discs, carpal tunnel syndrome in the right arm, and nerve damage in the left arm. Tr. 19, 77-82, 85, 143, 612-14. His applications were denied initially and on reconsideration. Tr. 59-60, 63, 67, 71, 616, 618-19. A hearing was held before an administrative law judge ("ALJ") on June 26, 2006, at which plaintiff's attorney appeared, but at which plaintiff himself failed to do so "due to some past issues with law enforcement." Tr. 19, 625-28.

A second hearing was held before the ALJ, at which plaintiff, represented by counsel, appeared and testified. Tr. 629-44. At the hearing, plaintiff amended his alleged onset date of disability to June 26, 2002. Tr. 634. On March 29, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

    (1)    at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

    (2)    at step two, plaintiff had "severe" impairments consisting of degenerative disc disease, left ulnar neuropathy, peripheral neuropathy, an affective disorder, and an anxiety disorder;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform a sedentary to light range of work, with certain additional non-exertional limitations, which precluded him from performing his past relevant work; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 19-31. Plaintiff's request for review was denied by the Appeals Council on October 30, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 404.981, § 416.1481.

On November 20, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

decision. (Dkt. #1-#3). On February 4, 2008, the administrative record was filed with this Court. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits for the following reasons:

> (a)     the ALJ erred in evaluating the medical evidence in the record;
>
> (b)     the ALJ erred in assessing plaintiff's credibility;
>
> (c)     the ALJ erred in evaluating the lay witness evidence in the record;
>
> (d)     the ALJ erred in assessing plaintiff's residual functional capacity; and
>
> (e)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact

inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.    Dr. Bateman

On April 15, 2002, plaintiff's treating physician, Michael Bateman, M.D., noted that on March 13, 2002, plaintiff "was returned to work on light duty," which he had "continued until this date." Tr. 277. Dr.

Bateman stated he would continue plaintiff's "current work restrictions," but hoped "that over the next several weeks, he would improve." Id. On April 18, 2002, Dr. Bateman again noted plaintiff was "on a light duty at this time," and continued "his current light-duty status." Tr. 276. On May 15, 2002, Dr. Bateman stated that he had asked plaintiff "to return to work tomorrow and work in a limited capacity with avoiding lifting over 5 pounds, carrying over 5 pounds, no bending, turning, twisting, climbing of heights, avoid[ing] ladders, and so forth." Tr. 275.

In early June 2002, Dr. Bateman suggested that plaintiff "continue back at work with the same work restrictions that he has had." Tr. 274. On December 23, 2002, Dr. Bateman noted plaintiff was released to full-time work by W. Brandt Bede, M.D., in September 2002, but he was "[n]ot allowed to participate in light duty" at work secondary to "[c]ompany policy." Tr. 508. On December 31, 2002, Dr. Bateman stated he understood that plaintiff had "exhausted the light duty time frame that was available to him and that he" had "been terminated from his employment." Tr. 505. Dr. Bateman also stated he did feel plaintiff could work, but it would "just have to be in a limited capacity until he had further full diagnostic and therapeutic plans." Tr. 506. However, he did not feel plaintiff was "totally disabled." Id.

In early February 2003, Dr. Bateman stated he disagreed that plaintiff "could be released to regular duties," but agreed "he could go back to light duty as had been previously arranged." Tr. 502. On February 24, 2003, Dr. Bateman stated he did "think at this point that" plaintiff could "seek employment," but he told plaintiff that "the best thing" they "could do at this point" was "to utilize the service of [a] vocational counselor to get a work that is suitable for him." Tr. 501. Four days later, Dr. Bateman stated that plaintiff "was released to work in a part-time duty and should actively seek gainful employment even with his attending [physical] therapy." Id. In early March 2004, Dr. Bateman stated he did not think plaintiff would "be able to hold down a job in a restaurant or at least at this time and probably in any capacity," because of "both physical limitations as his medical condition" had "not improved and also from a psychological vantage point." Tr. 482.

The ALJ addressed Dr. Bateman's findings as follows:

> . . . [I]t appears clear that Dr. Bateman felt as recently as December of 2002 that the claimant was capable of performing light-duty work, but that his particular employer only allowed such work for a limited period of time, which the claimant exhausted on June 25, 2002. *See* Ex 29F/28-29. This is not inconsistent with my residual functional capacity assessment, as I have assessed significant limitations in the claimant's exertional functioning. I also note that Dr. Bateman discussed the claimant's

depression and anxiety at this visit as well, but gave no functional assessments and appeared to apply no vocational significance to the claimant's mental health symptoms. *See* Ex 29F/29.

In March of 2004, Dr. Bateman reviewed the claimant's record, in preparation for a deposition with regard to his claims with L&I [Washington State Department of Labor and Industries], and concluded that the claimant would not be able "to hold down a job in a restaurant or at least at this time and probably in any capacity." This statement is vague and, more important, conclusory. My assessment of the claimant's abilities requires a function by function analysis of his capabilities. *See* S.S.R. [Social Security Ruling] 96-9p[, 1996 WL 374185]. Dr. Bateman's opinion does not include such an analysis and is therefore given little weight.

Tr. 26-27. Plaintiff argues the ALJ erred in his assessment of Dr. Bateman's findings and opinions. First, he argues the ALJ incorrectly found Dr. Bateman deemed him to be capable of performing light-duty work in December 2002. Instead, plaintiff asserts, Dr. Bateman merely stated he was able to work "in a limited capacity," which does not mean full-time light work. The undersigned agrees.

It is true that being able to work in a limited capacity is not necessarily the same thing as being able to perform light work, which is defined as involving:

[L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); see also Social Security Ruling ("SSR") 83-10 (full range of light work requires standing or walking, off and on, for total of approximately 6 hours of 8-hour workday). In addition, while Dr. Bateman did feel that plaintiff "could go back to light duty" in early February 2003, and that he could seek employment on February 24, 2003, four days later Dr. Bateman stated that plaintiff "was released to part-time duty," and in early March 2004, that he would not "be able to hold down a job in a restaurant or at least at this time and probably in any capacity." Tr. 482, 501-02. Thus, it is not at all clear that Dr. Bateman believed plaintiff could perform full-time light work in late December 2002, and this certainly seems to not be the case in his more recent findings.

Plaintiff also takes issue with the ALJ's determination to give no vocational significance to Dr. Bateman's discussion of his depression and anxiety in late December 2002 (Tr. 506), because no functional assessments were given, and it appeared that no vocational significance was placed on

plaintiff's mental health symptoms. Plaintiff points out that Dr. Bateman stated it seemed to him that there was something which had "occurred both physically and mentally" to plaintiff since "his employment with Associated Grocers," that caused him to lose "interest in his normal activities," be "reluctant to perform any of the duties" he had done at home in the past and "not like to be around people or crowds." Id. These are merely statements regarding what plaintiff reported, however, and do not constitute objective medical functional assessments. In addition, as found by the ALJ, nowhere in the late December 2002 treatment note does Dr. Bateman actually opine as to any specific work-related limitations.

Lastly, plaintiff contests the ALJ's rejection of Dr. Bateman's early March 2004 opinion that he could not "hold down a job . . . probably in any capacity" (Tr. 482), as being vague and conclusory, and because it lacked a function by function analysis of vocational capabilities. The undersigned agrees the ALJ erred in so finding. Dr. Bateman's opinion is not vague, as he clearly stated plaintiff probably could not hold down a job in any capacity. The undersigned does find that opinion to be conclusory, because the only objective findings Dr. Bateman made consisted of some "diminished sensation," "painful range of motion" of the lumbar spine and a "painful left elbow" causing "some break-away weakness," which either alone or in combination would not appear to be of such severity as to cause plaintiff to be totally disabled. Id. Further, Dr. Bateman stated that he did not think anything had necessarily gotten demonstrably worse. Id. Again, this is hardly sufficient to support a finding of total inability to work.

`On the other hand, none of Dr. Bateman's treatment notes provide any more detailed support for his earlier determinations that plaintiff was capable of performing light work. In addition, as discussed above, Dr. Bateman at other times stated that plaintiff was only able to perform part-time work or merely in a limited capacity. Given that, also as discussed above, the ALJ erred in stating Dr. Bateman earlier had found plaintiff able to perform light work, without noting his other more qualified statements concerning plaintiff's ability to work, the ALJ should have sought additional information from Dr. Bateman regarding his opinion on that issue. Accordingly, remand to the Commissioner for further administrative proceedings to allow for this to occur and to re-evaluate Dr. Bateman's findings is appropriate here.

B. Dr. Johnson

In mid-December 2003, plaintiff underwent an independent medical examination conducted by H. Richard Johnson, M.D., who diagnosed him with the following conditions: a lumbosacral strain/sprain; left lumbar radiulopathy with left disc protrusion; an aggravation of pre-existing degenerative disc disease; a

cervical strain/sprain; a left shoulder strain; a right shoulder trapezius strain; a chest contusion; a left elbow contusion; left lateral epicondylitis; left ulnar entrapment neuropathy; an overuse syndrome of the right upper extremity; and a panic disorder with agoraphobia. Tr. 432-33. Dr. Johnson opined that plaintiff was "unemployable at any work level on a regular continuous basis," and that this was "due to the combination of both his physical and mental disorders." Tr. 433.

With respect to Dr. Johnson's opinion, the ALJ found as follows:

> I note that Dr. Johnson found the claimant to be unemployable because of the combination of his physical and mental impairments, using the rules for determining disability by the [Washington State] Department of Labor and Industries. *See* Ex 23F/14-15. I note first that, as acknowledged by our regulations, every governmental agency determines disability according to its own laws, and determinations made by other agencies are not binding on this agency. *See* 20 C.F.R. §§ 404.1504, 416.904. More important, Dr. Johnson did not perform a function by function assessment of the claimant's capabilities, as required by our analysis, but simply declared that the claimant met the criteria for disability under the state regulations for Labor and Industries. *See* S.S.R. 96-9p. Dr. Johnson's findings, therefore, are of little help in my analysis, and I give them little weight.

Tr. 27. Plaintiff argues the ALJ erred here by requiring Dr. Johnson to perform a function by function analysis, asserting it is the ALJ's duty to perform that analysis, not Dr. Johnson's. While true, the ALJ merely was pointing out that such a function by function analysis must be performed by the Commissioner, and that the lack of any specific functional assessment conducted by Dr. Johnson provided "little help" in that regard. Indeed, Dr. Johnson provides no opinion as to any particular work-related limitations plaintiff might have, despite, as noted by plaintiff, the fairly long report he wrote. See Tr. 420-34.

Plaintiff notes that Dr. Johnson conducted routine testing and provided a review of medical reports, along with detailed summaries. Again, however, none of this constitutes an opinion regarding actual work-related abilities and/or limitations. Plaintiff also points to the following additional opinion provided by Dr. Johnson as evidence of a specific work-related functional assessment:

> Using the AMA Guides To the Evaluation of Permanent Impairment, and given the evidence of ulnar entrapment at the elbow, he has a 20% impairment of the left upper extremity. Because of his ongoing left upper extremity problems, he has an overuse syndrome of the right upper extremity with resultant loss of function equal to at least a 10% impairment of the right upper extremity.

Tr. 434. There is no indication in the record though as to what those percentage impairments indicate or if they translate to the kind of work-related findings required in social security determinations. As such, the

1    undersigned finds this particular opinion to be of little, if any, relevance here.

2        C.    Dr. Bhaskar

3        In early December 2003, plaintiff was evaluated by Padmini Bhaskar, M.D., who diagnosed him

4    with "[p]ossible epicondylitis of the left elbow, with mild ulnar neuropathy," anxiety, depression, and

5    "[c]hronic back pain due to disc disease." Tr. 419. Dr. Bhaskar also provided the following assessment of

6    plaintiff's functional capabilities:

7        The number of hours the claimant could be expected to stand and walk in an eight-hour
         workday with intervals is approximately about four hours. Some limitation could be
8        due to his bulging discs and degenerative disc disease. The number of hours the
         claimant could be expected to sit in an eight-hour workday is approximately four hours.
9        Some limitation could be due to his disc disease and also herniated disc. Regarding
         assistive devices, one is not medically necessary to use. The amount of weight that the
10       claimant could lift or carry, frequently or occasionally, is approximately 20-30 pounds.
         Some limitation could be due to his back pain. There are some postural limitations
11       noted on bending and he could do stooping or crouching occasionally, but not
         frequently. There are no manipulative limitations noted on reaching, handling, feeling,
12       grasping, and fingering, occasionally or frequently. There are no relevant visual or
         communicative limitations noted. The only workplace environmental limitation could
13       be due to his chronic back pain secondary to bulging discs, anxiety and depression, and
         some residual neuropathy of the left arm.

14   Id.

15       With respect to Dr. Bhaskar's functional assessment, the ALJ found as follows:

16
17       My [residual functional capacity] assessment is both more limited and less limited than
         Dr. Bhaskar's assessment on consultative examination. This doctor found after
18       examining the claimant one time that he was able to lift 20-30 pounds on an occasional
         and frequent basis. This is less restrictive than the weight amounts I find for the
19       claimant. But the doctor found that the claimant was able to sit for only 4 hours in an
         8-hour workday, stand and/or walk for only 4 hours in an 8-hour workday, which is
20       more restrictive. *See* 22F/6. I have considered Dr. Bhaskar's assessment, but find the
         [sic] it is not consistent with the bulk of the record or indeed that doctor's examination,
21       at which the claimant had a normal gait, was able to perform heel walking, toe walking,
         and tandem gait. Straight leg raise was to 60 degrees bilaterally. Ex 22F/5. There
22       were no areas of tenderness, crepitus, effusions, deformities, or trigger point
         tenderness. Motor strength was 5/5 bilaterally throughout. Sensory and reflex
23       examinations were normal, and the claimant's cranial nerves were grossly intact. Ex
         22F/6. It appears, considering these objective findings, that Dr. Bhaskar relied too
24       heavily on the claimant's subjective complaints of pain and limited functioning when
         assessing the claimant's residual functional capacity. And as discussed above, it is
25       clear from the claimant's and his witnesses' reports about his activities that the
         claimant is not as limited as he claims. I therefore give the consultative examination
26       little weight.

27   Tr. 27. Plaintiff argues the ALJ erred here by improperly substituting his own personal opinion for that of

28   Dr. Bhaskar, a trained medical doctor. See Gonzalez Perez v. Secretary of Health and Human Services,

     812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of

physician); <u>McBrayer v. Secretary of Health and Human Services</u>, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); <u>Gober v. Mathews</u>, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him). The undersigned disagrees.

As noted by the ALJ, Dr. Bhaskar found plaintiff capable of being able to sit and stand and/or walk for only four hours each in an eight-hour workday, which is inconsistent with a substantial portion of the medical evidence in the record. For example, W. Brandt Bede, M.D., another treating physician, opined on a number of occasions that plaintiff was able to perform light-duty work. <u>See</u> Tr. 268-69, 271. Franklin T. Paudler, M.D., who evaluated plaintiff in late May 2002, determined that he "should remain on light duty." Tr. 345. In late November 2002, Howard Quint, M.D., found plaintiff could sit, stand and walk for six hours each in an eight-hour day. Tr. 315.

On the other hand, as discussed above, while Dr. Bateman did find plaintiff capable of performing light work on several occasions, he also indicated that plaintiff was more limited than that at times, and, in addition, most recently opined that he probably could not work in any capacity. Also as discussed above, Dr. Johnson determined him to be "unemployable at any work level on a regular and continuous basis." Tr. 433. In late May 2004, David L. Deutsch, M.D., a non-examining physician only found plaintiff capable of standing and/or walking for at least two hours, rather than for six hours, in an eight-hour workday. Tr. 317. Given that the medical opinion evidence in the record regarding plaintiff's ability to perform light work is fairly evenly divided, it cannot be said for certain that the ALJ's statement that the bulk of that evidence is inconsistent with Dr. Bhaskar's opinion is valid.

The ALJ, however, was not incorrect in noting that Dr. Bhaskar's sitting, standing and walking limitations were inconsistent with her own objective findings. For example, as noted by the ALJ, plaintiff exhibited a normal gait, was able to heel, toe and tandem walk, and there were no findings of tenderness, crepitus, effusions, or deformities. Tr. 417-19. In addition, plaintiff had intact muscle strength, a normal sensory examination, and normal reflexes throughout. Tr. 419. As such, there is little in the way of objective findings to support the sitting, standing and walking limitations Dr. Bhaskar found, and the ALJ therefore validly rejected them on this basis. <u>See</u> <u>Batson</u>, 359 F.3d at 1195 (ALJ need not accept opinion of treating physician if it is inadequately supported by clinical findings).

For the same reasons, the ALJ also was not remiss in determining that Dr. Bhaskar appeared to have "relied too heavily" on plaintiff's subjective complaints in assessing his residual functional capacity. Tr. 27. The opinion of a physician premised to a large extent on a claimant's own accounts of his or her symptoms and limitations may be disregarded where those complaints have been properly discounted. Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999); see also Tonapetyan, 242 F.3d at 1149. In this case, as discussed in greater detail below, the ALJ properly discounted plaintiff's credibility. Plaintiff argues that Dr. Bhaskar's report indicated the medical bases for the functional limitations she found, including disc disease, back pain and residual neuopathy of the left arm. But these are merely diagnoses without accompanying objective findings. As such, those diagnoses are insufficient in themselves to support the limitations found by Dr. Bhaskar.

D.   Dr. Khan

In early January 2006, Muhammad Bilal Khan, M.D., a treating physician, completed a physical evaluation form, in which he diagnosed plaintiff with "S1 Radiculopathy" and a seizure. Tr. 598. Dr. Khan found plaintiff's radiculopathy had resulted in a "[v]ery significant interference with the ability to perform" the work-related activities of lifting and carrying. Id. Dr. Khan also found plaintiff's seizure had resulted in an "[i]nability to perform" all of the following activities: sitting, standing, walking, lifting, handling, carrying, seeing, hearing, communicating, and understanding or following directions. Id. In addition, Dr. Khan found that bending, climbing, handling, pulling and pushing restricted plaintiff's mobility, agility or flexibility, and that his overall work level was sedentary. Id. He estimated that without medical treatment, plaintiff would be continue to be so limited for six months. Tr. 600.

The ALJ stated in his decision that his assessment of plaintiff's residual functional capacity was "generally consistent" with Dr. Khan's conclusion that plaintiff was capable of performing sedentary work. Tr. 28. Plaintiff argues that in assessing his residual functional capacity, the ALJ did not account for the specific limitations Dr. Khan found resulted from his radiculopathy and seizure, or the further limitations on pulling and pushing. The undersigned finds, however, that the ALJ was not required to adopt any of the limitations Dr. Khan found were due to a seizure. As the ALJ previously found:

> There is also brief mention in the record of a seizure disorder, for, [sic] but I find this condition not to be medically determinable. I found only 2 references in the record to this impairment (see Ex 44F/1, 8), and no objective testing or other objective medical evidence establishing this as a medically determinable impairment. At the hearing the

claimant reported that he had not had a seizure in quite a while. Because there is no objective evidence to establish this impairment, I do not find that it is a "severe" impairment, as defined by the regulations.

Tr. 23. The substantial evidence in the record supports this determination. Thus, any limitations based on a diagnosis of a seizure also are not supported by substantial evidence.

The undersigned does find though that the ALJ erred in failing to address the lifting and carrying limitations found by Dr. Khan. As noted above, Dr. Khan limited plaintiff to sedentary work, which the form Dr. Khan completed defined as "the ability to lift 10 pounds maximum" and frequently "lift and/or carry such articles as files and small tools." Tr. 598. The ALJ, however, assessed plaintiff with the less limited ability to "lift and carry 20 pounds occasionally and 10 pounds frequently." Tr. 24. The ALJ's assessment here thus is inconsistent with that of Dr. Khan. Even though the ALJ accepted the sedentary work opinion offered by Dr. Khan, he did not explain why he was not also adopting the lifting and carrying limitations implied thereby.

As to the pulling and pushing limitations found by Dr. Khan, the undersigned once more finds the ALJ was not required to adopt them. First, Dr. Khan gave no indication as to how limited he felt plaintiff was in those areas. As such, even if the undersigned did find the ALJ had erred in not adopting them, it is not at all clear how any such limitations would affect plaintiff's residual functional capacity. In addition, no other medical source in the record has found plaintiff is limited in any specific respect in regard to his ability to push and/or pull. See, e.g., Tr. 317, 419. Dr. Quint did find there to be "occasional manipulative limitations because of left elbow discomfort with reaching," but gave no indication that plaintiff's ability to push and/or pull was affected. Tr. 315. Accordingly, the substantial evidence in the record fails to support any limitation in plaintiff's ability to push and/or pull.

E.   Dr. Perry

In mid-November 2002, David J. Perry, Ph.D., a treating psychologist, completed a mental status report, in which he stated plaintiff could not work at this time, and could not work "without exacerbating" his anxiety disorder and panic attacks. Tr. 307. Dr. Perry further stated that plaintiff could not "concentrate at work where physical injuries occurred," that at work his task completion, concentration and follow through were impaired by his anxiety and "panic issues," and that he could not function on the job without "serious" anxiety, tightness in his chest and panic. Tr. 309-10. Dr. Perry did state that

1  medications helped plaintiff, but also that they were "less effective" at work than at home, as their

2  "effects" both at work and while driving were "impairing". Tr. 310.

3          In late May 2005, Dr. Perry completed a psychiatric attending physician's statement of disability,

4  in which he opined that plaintiff's poor concentration, focus and follow through on work tasks, as well as

5  his anxiety around others affected his performance/occupational functioning. Tr. 589.  Dr. Perry further

6  opined that plaintiff was unable to work due to his physical and emotional/attention impairment. Id.  In

7  addition, Dr. Perry stated there were no current accommodations or modifications to the work setting that

8  would assist plaintiff in returning to work, and that it was unknown when plaintiff would be able to return

9  to work or how long his limitations would last. Id.

10         The ALJ addressed Dr. Perry's opinions as follows:

11     In November of 2002, the claimant's psychologist, David Perry, Ph.D., reported that
       the claimant's anxiety symptoms were affecting his social relationships and declared
12     that the claimant could not return to work without exacerbating his anxiety disorder and
       panic attacks. Ex 9F/1.  He reported that the claimant's anxiety limited the claimant's
13     group activities.  Regarding his concentration, persistence, or pace, the doctor opined
       that these were affected by the claimant's anxiety and panic issues and reported that the
14     claimant could not concentrate at work "where physical injuries occurred."  Ex 9F/3.
       The doctor concluded that the claimant could not work without "serious anxiety,
15     tightness in chest, & panic."  Ex. 9F/4.  I have considered this evaluation, but note that
       Dr. Perry appeared to feel that the claimant was unable to return to his specific past
16     work, not to employment in general.  He noted that the claimant did "much better" at
       home, but this does not mean that he was unable to function in the workplace.
17
       It appears that the claimant has specific stressors associated with his last job and the
18     kind of work he then performed, due to the injuries he sustained.  But I do not find that
       Dr. Perry's opinion establishes that the claimant is unable to return to any gainful
19     activity whatsoever.  It is clear that the claimant is exertionally precluded from
       performing his past work, and considering Dr. Perry's assessment, it is clear that he is
20     unable to do so from a mental health standpoint as well.  But my analysis requires a
       determination of the claimant's ability to return to other work that exists in significant
21     numbers in the economy.  I do not find that Dr. Perry's opinion addresses that question.

22     In May of 2005, Dr. Perry opined that the claimant was not capable of working in any
       job due to "physical & emotional/attention impairment." Ex. 44F/23.  The record
23     shows that Dr. Perry had been providing therapy for the claimant in the months leading
       up to this conclusion; however, it is not clear how he came to his conclusions, as there
24     is no evidence of a mental status examination or other assessment of the claimant's
       functioning beyond his subjective complaints.  See Ex 44F.  Because his opinion is
25     conclusory and lacks a function by function analysis, I give this conclusion little
       weight.

26  Tr. 28-29.  Plaintiff argues these are not valid reasons for rejecting Dr. Perry's opinions.  The undersigned

27  agrees.

28          With respect to the mid-November 2002 opinion, it is not clear that Dr. Perry appeared to feel that

plaintiff was unable to return only to his specific past work. It is true that Dr. Perry did state that plaintiff could not concentrate at the work where his physical injuries occurred. In a separate, previous section of the evaluation form Dr. Perry completed, however, he stated in general that plaintiff would not work at this time or without exacerbating his anxiety disorder and panic attacks. In so stating, Dr. Perry did not appear to limit his opinion to plaintiff's past work. Elsewhere, Dr. Perry stated that anxiety was more limiting for plaintiff both in groups and at work and that he could not function on the job without causing him serious anxiety, chest tightness and panic, again without reference to his specific past work. In addition, even if, as the ALJ states, Dr. Perry's opinion that plaintiff did much better at home does not necessarily mean he felt plaintiff was unable to work, it still could constitute a significant limitation in the ability to work, as could Dr. Perry's opinion that plaintiff was more limited in crowds.

In regard to Dr. Perry's late May 2005 opinion, the undersigned finds the ALJ's reasons for rejecting it are invalid as well. Contrary to the ALJ's findings, it appears that Dr. Perry did perform a mental status examination at the time he completed the evaluation form. See Tr. 589. Indeed, Dr. Perry made findings with respect to affect, mood, speech, judgment, cognition, and thought process and content among others. Dr. Perry further made specific findings regarding psychological factors that might affect plaintiff's ability to function occupationally, including poor concentration, focus and follow through on work tasks, anxiety around others and agoraphobia. Thus, while Dr. Perry may have provided his opinion on a two-page form, at least some of his conclusions concerning plaintiff's ability to work were based on findings obtained via mental status examination. Accordingly, although Dr. Perry may have not given a complete function by function analysis as the ALJ seems to have desired, Dr. Perry's findings do provide at least some objective support for this opinion that plaintiff was unable to work.

F.     Dr. Snodgrass

In late November 2003, Lanny L. Snodgrass, M.D., Ph.D., performed a psychiatric evaluation of plaintiff, diagnosing him with the following impairments: an obsessive compulsive disorder by history; a panic disorder with agoraphobia; an adjustment disorder with symptoms of depression and anxiety; alcohol abuse in remission; and a global assessment of functioning ("GAF") score of 55 to 60. Tr. 412. Further, Dr. Snodgrass stated it was "uncertain whether psychiatric treatment at this juncture would be curative in nature considering his pattern of entrenched and fairly lifelong characteristics." Tr. 413.

Dr. Snodgrass performed a follow-up psychiatric evaluation in late February 2004, consisting of an interview pursuing "various questions relating to" plaintiff's "psychiatric condition and symptomatology more in-depth and with regards to the quality of his life, specific daily activity issues, and job related and personal history." Tr. 474. Dr. Snodgrass concluded at that time that:

> In my opinion, on a more probable than not basis, it appears that this claimant does have a preexisting psychiatric condition, which would approximate a category II according to the WAC [Washington Administrative Code] codes of partial permanent mental health impairments prior to the industrial injuries. It is also my opinion that his preexisting psychiatric condition was *lit up/aggravated and aggravated by the industrial injury on a more probable than not basis and that his present condition is at a category 3 of the WAC codes for permanent partial mental impairment. At this juncture, it appears that he is suffering from both anxiety and agoraphobia and paranoia as well as depressive symptoms.

> Although he tends to minimize his depression, it appears from the second interview that there are obvious signs of underlying depressive symptoms still evident, chronic. The quality of his life has changed markedly since the covered injury of 1988 with what appears to be progressive manifestations of this psychiatric condition. In my opinion he is not employable.

Tr. 478.

The ALJ found in his decision that Dr. Snodgrass "did not assess" plaintiff's "functioning or opine whether he was able to perform his past work or any other work," and that the focus of his evaluation "was the causal relationship, if any, between" his "several workplace injuries and his mental health symptoms." Tr. 29. Plaintiff argues the ALJ was incorrect in finding no opinion regarding his ability to work. Clearly the ALJ erred here since, as noted above, Dr. Snodgrass expressly concluded at the end of his late February 2004 report that plaintiff was "not employable." In addition, while the focus may have been on the causal relationship between plaintiff's symptoms and his workplace injuries, this alone is not a valid basis for not crediting Dr. Snodgrass's opinion. Given that the ALJ did not provide any other reasons for rejecting that opinion, the ALJ's determination here was erroneous.

G.   Dr. Wanwig

In early March 2003, J. Daniel Wanwig, M.D., completed a psychological/psychiatric evaluation form, in which he diagnosed plaintiff with moderate major depression, finding him to be moderately limited in his ability to relate appropriately to co-workers and supervisors as a result thereof. Tr. 359-60. Dr. Wanwig, however, also stated that plaintiff improved with medications, that mental health intervention likely would restore or substantially improve his ability to work for pay in a regular and predictable

1 manner, and that the estimated amount of time he would remain impaired to the degree indicated was four

2 to eight months. Tr. 360-61.

3   Dr. Wanwig completed a psychiatric attending physician's statement of disability in early January

4 2006, in which he diagnosed plaintiff with major depression, anxiety and a GAF score of 35. Tr. 558, 563.

5 Dr. Wanwig indicated, however, that there were no psychological factors that might affect plaintiff's

6 ability to function occupationally, and that he was not unable to work due to his impairments. Tr. 559. At

7 the same time, Dr. Wanwig also completed a behavioral function evaluation form, in which he appears to

8 have opined that plaintiff could not perform his regular work duties due to arm and back injuries. Tr. 560.

9 In addition, Dr. Wanwig found plaintiff had no ability to maintain a work pace appropriate to the work

10 load due to physical factors and a moderate ability to do so due to mental factors, and had: no ability to

11 relate to others beyond giving or receiving instructions or to deal with the public; a minimal ability to

12 make generalizations, evaluations or decisions without immediate supervision and to perform effectively

13 under stress; and a minimal to moderate ability to perform to precise set limits, tolerances or standards. Tr.

14 561. Dr. Wanwig defined stress as "[b]eing around others" and "[f]ear of injury." Id.

15   With respect to the above findings, the ALJ stated that:

16   My assessment of the claimant's mental health functioning is generally consistent with
the findings of the claimant's internist, Dr. Wanwig, who completed an evaluation of

17   the claimant's functioning for [the Washington State] DSHS [Department of Health and
Human Services] in March of 2003. The doctor, an internist and a psychologist,

18   according to the claimant, with whom the claimant had treated for several years, found
at most mild limitations in cognitive and social functioning, except for a moderate

19   limitation in the claimant's ability to relate appropriately to co-workers and
supervisors. I note that the doctor found only a mild limitation in the claimant's ability

20   to interact appropriately in public contacts. Ex 17F/3. This is inconsistent with the
bulk of the record, which shows that the claimant has difficulty with crowds and

21   strangers, but appears to interact fine with his friends. *See* Ex 19E, 16E (witness
statements from the claimant's friends). Even Dr. Wanwig noted that the claimant's

22   anxiety increased in crowds. Ex 17F/1. *See also* Ex 19F (DSHS evaluation in August
of 2003 in which Bruce A. Eather, Ph.D., found at most only mild limitations in

23   cognitive and social functioning except for a moderate limitation in interacting
appropriately in public contacts). Dr. Wanwig later filled out a Behavioral Function

24   Evaluation Form for the claimant's insurance company, in which he assessed
"minimal" or "no" ability on various cognitive or social functions. This form was

25   provided by the insurance company, and Dr. Wanwig provided no explanation for any
of his findings beyond "defining" the claimant's stresses as follows: "being around

26   others. Fear of injury." Ex 43/5. Nor is it clear from the doctor's treating notes why
he found as he did. For example, I find nothing in the record to support the doctor's

27   findings that the claimant has "minimal ability" to "influence other's attitudes,
judgments or opinions." *See* Ex 43F/5. This report is nothing more than a check-off

28   form. Under our analysis detailed analyses are preferable to check-off reports, and
when such reports do not contain an explanation of the reasons for their conclusions,

they may be rejected. *See e.g., Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996). Therefore, I give Dr. Wanwig's assessment of the claimant's symptoms and functionality expressed in this conclusory form very little weight.

Tr. 28.

Plaintiff disagrees with the ALJ's findings here, asserting that the rejection of a treating physician's opinions merely because those findings are contained in a questionaire is inappropriate. While true, the Ninth Circuit has expressed a preference for individualized medical opinions over "check-off" reports. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983). Further, as noted above, an ALJ need not accept the opinion of a treating physician if it "is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149. Both of these factors are present in regard to the behavioral functional evaluation form Dr. Wanwig filled out in early January 2006.

Plaintiff argues in addition that an ALJ has a duty to develop the record, implying that the ALJ in this case should have questioned Dr. Wanwig regarding his conclusions, and that leading "yes-no" type questions are appropriate in order to elicit a physician's medical opinion. Here, though, the ALJ did not discount Dr. Wanwig's findings on the basis that he was asked leading questions. In addition, while the ALJ does have a duty to fully and fairly develop the record, the duty to further develop the record is triggered only when it "is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). As found by the ALJ, there is little in the way of objective clinical findings in Dr. Wanwig's evaluation form or treatment notes to support the severe functional limitations he opined to in early January 2006, thus allowing the ALJ to properly reject those limitations due to that lack of objective support therefor. As such, the undersigned finds no error here.

II.     The ALJ Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

(9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part for the following reason:

> . . . [W]hile the claimant is clearly unable to perform his past relevant work currently, it appears he did not initially stop working in 2002 because of the functional effects of his impairments. Dr. Bateman released the claimant to light duty work in early to mid-2002, but the claimant stopped working on June 25, 2002 because he had "exhausted the light duty time frame that was available to him" by his employer. Ex 29F/28. The claimant was released back to full duty without any restrictions on September 2, 2002. Ex 29F/28. His work history at this point is confusing because the record makes reference to a 60-day incarceration in August of 2002 after receiving a second DUI charge in 2 weeks. *See* Ex 16F/5; 21F/9, 29F/25, claimant's testimony. It is thus clear that the claimant stopped working not because he was unable to perform any work related activities, but rather because his employer would no longer support his working at "light duty" and/or because he was incarcerated for 60 days.

Tr. 25. Plaintiff argues this is not a clear and convincing reason for discounting his credibility, in light of the fact that an alleged onset date can be amended, and there are medical opinions in the evidence that he is not employable. The medical opinions plaintiff points to, however, are dated after both the date plaintiff initially alleged he became disabled, and his amended onset date. In any event, what is relevant here is that as pointed out by the ALJ, the evidence in the record indicates plaintiff initially stopped working at his past relevant work, not because of his functional limitations as he originally alleged, but because the light duty time frame available at his old employer had been exhausted. This discrepancy between what plaintiff had reported and what the evidence shows does impact his credibility. Accordingly, the ALJ was

not remiss in discounting plaintiff's credibility on this basis.

The ALJ also discounted plaintiff's credibility in part due to inconsistencies in his "reports to his providers about his drug and/or alcohol history and other matters, which shed doubt on the credibility of his assertions," further finding specifically that:

> . . . The claimant reported in various places in the record that he drank alcohol only occasionally and claimed that his alcohol use was not excessive. Ex 21F/10. In August of 2002, however, the claimant incurred 2 DUI charges in 2 weeks. Ex 16F/5; 21F/9. The claimant also denied drug use in various parts of the record. He told Dr. [Douglas P.] Robinson[, M.D.,] in March of 2003 that he had tried virtually every street drug except peyote buttons, including IV heroin on one occasion, but claimed that he did not like any of them and did not abuse them. Ex 16F/8. In November of 2003, the claimant denied illicit substances in his history. Ex 21F/10. But when confronted with possible violations of his pain contract with Sea Mar Clinic, where the claimant transferred after he stopped seeing Dr. Wanwig, the claimant admitted to having a drug problem in the past. *See* Ex 44F/3. I stress that I not [sic] finding that the fact of the claimant's past drug or alcohol use sheds doubt on his credibility; but rather that his inconsistencies when reporting about this use damage his credibility. Other inconsistencies shed further doubt. For example, in February of 2004, the claimant reported that he traveled by way of public transportation, riding in car, or driving, but in this same document, the claimant reported that he did not have a driver's license. *See* Ex 18E/3. In April of 2004, the claimant again reported that he drove. Ex 17E/3.

Tr. 25-26. Plaintiff argues this is not a clear and convincing reason for discounting his credibility either, as substance abuse is a disease characterized by denial, there is no evidence similar inconsistencies exist with respect to his pain and limitations, and no physician has suggested that he is malingering or exaggerating his symptoms. The undersigned disagrees.

First, the issue here is not whether or not plaintiff is in denial about the severity of his substance abuse problems, or whether or not he has a substance abuse problem, but that he has provided inconsistent statements regarding his of drugs and alcohol. In addition, the ALJ pointed to other inconsistencies in his statements that do not concern his substance use. In any event, there is no actual evidence that plaintiff is in such denial, and, therefore, the ALJ's treatment of plaintiff's statements as being inconsistencies bearing on his credibility is not unreasonable. See Allen, 749 F.2d at 579 (credibility determination may not be reversed where it is based on contradictory or ambiguous evidence).

Inconsistencies that do not directly concern a claimant's symptoms and/or limitations, furthermore, still can reflect adversely on that claimant's credibility. See Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility evaluation such as reputation for lying and other testimony that appears less than candid). Finally, a physician or medical source does not have to suggest or imply malingering or

symptom exaggeration on the part of a claimant, in order for an ALJ to find that claimant is not credible. Otherwise, most credibility determinations would not withstand scrutiny. Rather, a finding of malingering or symptom exaggeration is necessary only to avoid the clear and convincing standard. Accordingly, the undersigned does not find any error on the part of the ALJ here as well.

Lastly, the ALJ found plaintiff's "self-reported activities," and the report of his friend and neighbor regarding those activities, also shed "doubt on the credibility of his complaints." Tr. 25. To determine if a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

The ALJ found the following reported activities impugned plaintiff's credibility:

> . . . [I]n November of 2002, the claimant reported that, while it took longer to do these things than it used to, he was capable of such household chores as dusting, loading he [sic] dishwasher, vacuuming, cooking, raking, sweeping, and hosing off the patio. Ex 4E/2. The claimant injured his thumb after being bitten by a dog when trying to put on a leash. In December of 2003, the claimant reported injuring his toe when he dropped a skill saw on it. Ex 29F/11. He reported that he performed household chores and yard work, including laundry and using the riding lawnmower. Ex 22F/3. In February of 2004, the claimant reported that he was still able to do household chores such as dusting, vacuuming, and dishes. Ex 18E/2. In April of 2004, the claimant's neighbor and friend, Elizabeth J. Dahle, reported that the claimant was able to do his own laundry and use his riding lawn mower some days. Ex 19E/1. The claimant confirmed this in his statement from the same month. See Ex 17E/2. I find that working with a skill saw, riding mower, and walking a dog are activities that exceed the claimant's alleged abilities.

Tr. 25. Plaintiff argues there is no indication that any of the above activities were performed on a sustained basis or required the functional abilities he lacks. The undersigned agrees plaintiff's reported activities of daily living did not provide a valid basis upon which to discount his credibility. This is because the record for the most part fails to show those activities were performed at a level sufficient to indicate plaintiff spent a substantial part of his day engaged in them in a manner indicative of an ability to engage in sustained employment. See Tr. 106-08, 111-13, 119-20, 124-25, 152-54, 157-59, 177-81, 186-88, 191-93, 197-201. In addition, putting a leash on a dog, dropping a saw on one occasion and riding a lawn mower on "some days," does not alone establish plaintiff regularly engaged in these activities, nor is it clear exactly to what extent plaintiff walked the dog, used the saw or rode his mower each time, even if

1  such activities evidenced an ability to perform work tasks.

2      Nevertheless, the fact that one of the reasons for discounting plaintiff's credibility was improper,

3  does not render the ALJ's credibility determination invalid, as long as that determination is supported by

4  substantial evidence in the record, as it is in this case. Tonapetyan, 242 F.3d at 1148. That is, the ALJ here,

5  as discussed above, provided at least two valid reasons for discounting plaintiff's credibility. As such, the

6  undersigned finds the ALJ's credibility determination overall was proper here.

7  III.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

8      Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

9  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

10  each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). An ALJ may discount lay

11  testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

12  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence). In

13  rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons"

14  for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

15  those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ

16  also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

17      The ALJ treated the lay witness evidence in this case as follows:

18      Turning to the lay witness statements, I generally agree with the assertions contained
       therein. See Ex 19E, 16E. Both witnesses reported that the claimant had difficulty
19      paying attention and following instructions. I agree, which is why I have limited him to
       simple, repetitive tasks. Both said he had difficulty going out in public or with crowds.
20      I agree with this as well, which is why I have limited the claimant to no public contact.
       But it appears clear from both statements that the claimant is likely able to interact with
21      co-workers and supervisors, as it is clear that he is capable of socializing with these
       friends without difficulty. Ms. [Elizabeth J.] Dahl reported that she and the claimant
22      spent a lot of time together, performing household chores, talking, watching television,
       listening to music. Ex 19E/5. Mr. [Joseph S.] Randazee reported that he spent time
23      with the claimant once or twice a week. Ex 16E/5. Both witnesses reported knowing
       the claimant for 5 years, so he is clearly able to sustain relationships. The other
24      limitations in functioning reported by the witnesses appear clearly related to the
       claimant's physical limitations, not to motivational or other problems attributable to his
25      mental health impairments. I agree with this as well, which is why I have limited the
       claimant to the sedentary to light exertional level. I note that both witnesses reported
26      that the claimant is not the person he used to be, and it appears clear from the medical
       evidence of record that this is indeed the case. My inquiry does not end there, however.
27      The issue is not whether the claimant has had deterioration in his functioning or even
       whether the claimant is able to do his past job. . . .
28
   Tr. 26. Plaintiff argues the ALJ erred by ignoring the fact that both lay witnesses described plaintiff

having fear of others and of leaving the house, consistent with the medical diagnosis of agoraphobia. It is true that these two witnesses described plaintiff's problems with going out and being in public, but, as noted above, the ALJ did note this and properly accounted for it by limiting him to no public contact. Plaintiff is correct, however, in criticizing the ALJ for finding that he likely is able to interact with co-workers and supervisors because he is capable of socializing with the lay witnesses without difficulty. Both witnesses are friends of plaintiff, and there is no indication that the ability to socialize with friends translates into an ability to relate to co-workers and/or supervisors, people with whom the same type of relationship may not exist. As such, the ALJ erred in discounting their statements on this issue.

The undersigned further agrees with plaintiff that the ALJ erred in stating he accounted for the two lay witnesses' reports of reduced concentration, by limiting him to simple, repetitive tasks. It is not at all clear that reduced concentration and a limitation to simple, repetitive tasks are synonymous. See, e.g., Ramirez v. Barnhart, 372 F.3d 546, 554 (3rd Cir. 2004). Indeed, the mental residual functional capacity forms that were completed by the state agency medical consultants in the record – whose findings the ALJ gave great weight in determining plaintiff's residual functional capacity – make a clear distinction between the ability to maintain attention and concentration and the ability to, for example, understand, remember and carry out short and simple instructions. See Tr. 29, 237, 321.

IV.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> . . . [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; to sit and to stand and/or walk intermittently for a total of 6 hours in an 8-hour workday, with no limitations with regard to pushing or pulling the above amounts. The claimant is able frequently to balance and occasionally to climb, stoop, kneel, crouch, and crawl. Despite his mental health impairments, the claimant is able to understand, remember, and carry out simple instructions; to make judgments commensurate with the functions of unskilled work, *i.e.*, simple work-related decisions; to respond appropriately to supervisors, coworkers, and usual work situations; and to deal with changes in a routine work setting not dealing [sic] the general public.

Tr. 24. Plaintiff argues the above assessment is erroneous, because the ALJ failed to incorporate therein any limitations on arm and hand usage. Although it is not clear whether the ALJ was required to include such limitations in his assessment, the undersigned does find the ALJ erred in not specifically considering the evidence with respect thereto in his decision.

There is medical evidence in the record indicating plaintiff has such limitations. For example, Dr. Quint opined that plaintiff had "occasional manipulative limitations because of left elbow discomfort with reaching." Tr. 315. In addition, at least one non-medical source also has opined that plaintiff is limited in his ability to reach, handle, finger, and feel. Tr. 234. On the other hand, Dr. Bhaskar concluded that there were "no manipulative limitations noted on reaching, handling, feeling, grasping, and fingering." Tr. 419. Dr. Deutsch also found no such limitations, and opined that plaintiff was unlimited in his ability to push and/or pull. Tr. 317-18. The evidence in the record on this issue therefore is mixed. As such, the ALJ was required to consider that evidence in determining whether to include any upper extremity limitations in his assessment of plaintiff's residual functional capacity.

Plaintiff next argues the ALJ erred in not addressing the diagnosis of agoraphobia in the record, the moderate limitation in the ability to respond to and tolerate work pressures and expectations found by Dr. Eather, and the numerous moderate mental functional limitations found by the non-examining state agency consulting medical sources. The undersigned agrees. As noted above, Dr. Snodgrass diagnosed plaintiff with a panic disorder with agoraphobia in his first evaluation, which, as discussed above, the ALJ erred in rejecting. Although it is not clear exactly what mental functional limitations may have resulted therefrom, this is an issue the ALJ should have addressed. At the very least, as discussed above, there is evidence in

the record that plaintiff does better at home than at work or in crowds.  Further, the ALJ did not mention or discuss the moderate limitation found by Dr. Eather, let alone state what weight, if any, he was giving to that finding.  The same is true with respect to the many moderate mental functional limitations found by the non-examining state agency consultants, whose findings, as noted above, the ALJ stated he accorded great weight.  <u>See</u> Tr. 237-39, 321-23.  The ALJ thus erred here as well.

The undersigned disagrees with plaintiff's assertion, however, that the ALJ appears to have limited plaintiff to working only six hours a day, and thus to less then full-time work.  It is true that the ALJ stated in his decision that plaintiff had the residual functional capacity "to sit and to stand and/or walk for a total of 6 hours in an 8-hour workday." Tr. 24.  Read in the context of the decision as a whole, though, it is clear that the ALJ did not intend the meaning given to this statement by plaintiff.  Nowhere else in the decision is there any indication the ALJ deemed plaintiff to be so limited.  Much more likely, as defendant argues, is that while not artfully stated, the ALJ meant to say here that plaintiff could sit and stand and/or walk for a total of six hours <u>each</u> in an eight-hour workday.

The undersigned also finds that the ALJ did not err in failing to include any limitations caused by sleepiness.  Plaintiff argues sleepiness is one of his medication side effects the ALJ should have adopted.  However, other than his own testimony, plaintiff points to no specific evidence in the record, medical or otherwise, establishing that he has any specific work-related limitations stemming therefrom.  In addition, as discussed above, the ALJ did not err in discounting plaintiff's credibility, and therefore did not have to include in his assessment of plaintiff's residual functional capacity any additional limitations testified to by plaintiff.  The ALJ also did not fail to articulate any reasons for rejecting the functional assessment given by plaintiff's physical therapist, who found, among other things, that plaintiff likely "would have difficulty sustaining gainful vocational activity on a reasonably continuous basis." <u>See</u> Tr. 522-36.  On the other hand, while the ALJ did address that assessment, he merely concluded that based "on his review" thereof, "as well as the record as a whole," plaintiff "should be able to sustain a full work schedule on a regular and continuing basis at the sedentary to light level." Tr. 27-28.  Although the above functional assessment does not come from a physician, the ALJ here did not provide the Court a sufficient basis on which to determine whether he rejected the therapist's for proper reasons.

V.    <u>The ALJ's Step Five Analysis</u>

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). The Grids may be used if they "*completely and accurately represent a claimant's limitations.*" Tackett, 180 F.3d at 1101 (emphasis in the original). That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in original). If the claimant "has significant non-exertional impairments," reliance on the Grids is not appropriate.[3] Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).

Here, the ALJ found that plaintiff had "the exertional capacity to perform substantially all of the requirements of sedentary work (as well as a significant degree of the requirements of light work), and considering his age, education, and work experience, a finding of 'not disabled' would be supported by the application of Medical Vocational Rules 201.28 and 201.21." Tr. 30-31. The ALJ found in addition that plaintiff's "nonexertional and mental health limitations would not significantly impact the number of jobs associated with sedentary and light work," finding further that:

> . . . As explained in the Rulings, the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, remember, and carry out simple instructions; to make simple work-related decisions necessary to function in unskilled work; to respond appropriately to supervisors, coworkers, and usual work situations; and to deal with changes in a routine work setting not dealing [sic] the general public. *See* S.S.R. 85-15. I find that the claimant is able to perform these basic mental demands. *See* S.S.R. 96-9p (explaining that a claimant is unable to make an adjustment to work that exists in significant numbers in the national or regional economy when nonexertional limitations erode the occupational base associated with the ability to perform sedentary work).

Tr. 31. Plaintiff argues the ALJ erred in so finding. The undersigned agrees. As discussed above, the ALJ erred in evaluating the medical and lay witness evidence in the record regarding both plaintiff's mental and physical limitations, and accordingly in assessing plaintiff's residual functional capacity. As such, it is not at all clear plaintiff has nonexertional impairments that do not significantly impact the number of jobs that are associated with sedentary and light work.

---

[3]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

VI.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

(1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical and lay witness evidence in the record, plaintiff's residual functional capacity, and his ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116. Here, although the ALJ did err in rejecting some of the medical opinion source evidence in the record, it is not at all clear that the ALJ would be required to find plaintiff disabled. In addition, no vocational expert testimony has been provided in this case.

It also is true that where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law. See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding that

when lay evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's limitations were sufficient to meet or equal listed impairment). As noted by the Ninth Circuit, however, the courts do have "some flexibility" in how they apply the "credit as true" rule. <u>Connett v. Barnhart</u>, 340 F.3d 871, 876 (9th Cir. 2003). Further, <u>Schneider</u> dealt with the situation where the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976. Here, while again the ALJ erred in rejecting some of the lay witness evidence in the record, it is not clear that the ALJ would be required to adopt it, nor, based on the record currently before the Court, does that evidence alone establish that plaintiff is disabled.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 7, 2008**, as noted in the caption.

DATED this 14th day of October, 2008.


Karen L. Strombom
United States Magistrate Judge